## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DEANDRE BRADLEY, #M05197, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18-cv-1381-NJR |
| | ) | |
| PINCKNEYVILLE CC NURSING | ) | |
| STAFF, | ) | |
| NURSE LORI, | ) | |
| NURSE SROKA, | ) | |
| COUNSELOR ROLLA, | ) | |
| LT. WEBB, | ) | |
| C/O MACALAHAN, | ) | |
| LT. KOSMA, | ) | |
| C/O LIND, | ) | |
| NURSE KIM, | ) | |
| LT. WRANGLER, | ) | |
| JANE DOE, | ) | |
| NURSE TERA, | ) | |
| NURSE READER, and | ) | |
| CORRECTIONAL STAFF, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Deandre Bradley, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. In his Complaint, Plaintiff claims among other things that the defendants have failed to accommodate his disabilities, have retaliated against him, and have been deliberately indifferent to his serious medical issues, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. §§ 794-794e, and the First and Eighth Amendments. (Doc. 1).

As an initial matter, the Court notes that Plaintiff has not paid the $400 filing fee, nor has he sought leave to proceed *in forma pauperis* ("IFP") in this case as he is required to do. *See* 28 U.S.C.

§ 1914(a). As a matter of course, the Clerk of Court has sent notice that Plaintiff has 30 days to either pay or move for IFP status. (Doc. 3). Regardless, because Plaintiff seeks emergency injunctive relief, the Court will immediately take up the case. *See Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680 (7th Cir. 2012). Nonetheless, Plaintiff must still meet his obligations with regard to the filing fee. Specifically, Plaintiff must either pay the $400 filing fee or submit a motion for leave to proceed IFP in this action, together with his inmate trust fund account statement for the six-month period prior to the filing date of this case, no later than **July 30, 2018**. If Plaintiff fails to either pay or submit his IFP motion, this action shall be subject to dismissal for failure to comply with an order of the Court. *See* Fed. R. Civ. P. 41(b).

The Court next will conduct a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening** – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) **Grounds for Dismissal** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
> > (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
> > (2) seeks monetary relief from a defendant who is immune from such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that any reasonable person would find meritless. *Lee v. Clinton*, 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

Upon careful review of the Complaint and any supporting exhibits, the Court finds it appropriate to allow this case to proceed past the screening stage.

## The Complaint

In his Complaint (Doc. 1), Plaintiff makes the following allegations: Plaintiff is being retaliated against for his grievance writing and verbally speaking out against deprivations at the prison. (Doc. 1, p. 2). Plaintiff's life is in danger and will be in danger "unless the Plaintiff is removed from Pinckneyville" and placed in a facility with protective custody. *Id.* Plaintiff is wheelchair bound and cannot currently walk, even with a walker. (Doc. 1, pp. 4-5). Plaintiff also suffers from digestive issues that require him to use enemas and special assistive devices such as non-adhesive external male catheters with a urinary bag and adult male briefs that do not have the adhesive used on regular diapers because such adhesive severely irritate Plaintiff's skin, causing blisters, sores, and skin loss. (Doc. 1, p. 6). These issues can cause and have caused Plaintiff to suffer from infections. *Id.* Plaintiff also has a "severe respiratory issue" that requires him to be separated from mace and heavy cleaning substances that would affect his breathing. *Id.* He is required to keep an asthma pump on him at all times. *Id.*

Plaintiff's physical condition, which requires him to sit or lie down all day, makes certain pressure reduction devices including wheelchair cushions and air or egg crate pressure reduction mattresses necessary. (Doc. 1, p. 7). Not providing Plaintiff with the accommodations he needs "will cause complications such as friction and shearing to the Plaintiff's skin and pressure sore[s]. Damaged skin not taken care of can lead quickly to infections or deadly diseases such as sepsis . . . and staph infections and medical staff are aware of this." *Id.*

Defendants know that Plaintiff has no problem with writing grievances and going to court for relief when necessary. (Doc. 1, p. 8). Writing grievances has caused Plaintiff trouble. *Id.* He has been assaulted by staff and false disciplinary reports have been written against him. *Id.* Since Plaintiff has arrived at Pinckneyville, he has been writing grievances against medical staff for refusing to do their

job when Plaintiff requests necessary items. (Doc. 1, p. 9). For example, Plaintiff arrived at Pinckneyville with special supplies including non-adhesive external male catheters and adult male briefs without adhesive. (Doc. 1, p. 10) The Pinckneyville first shift nursing staff did not want to order the same supplies that Plaintiff had been receiving and instead tried to give him supplies that are dangerous to his skin. *Id.* Even after an emergency grievance, the nursing staff refused to provide or order the supplies, so Plaintiff had to use others which caused him "severe penis injury to his skin area." *Id.* Plaintiff had to address the doctor and Assistant Warden Love to get the day shift nursing staff to cooperate. *Id.*

As a result of Plaintiff's complaints and grievances, staff began to retaliate against him by claiming that he was "cheeking" his medication, which he was not. (Doc. 1, p. 11). One day, Plaintiff overheard Nurse Lori tell another nurse that she crushes Plaintiff's medication and opens his capsules, so he cannot tell what she is giving him. *Id.* Lori also noted that Plaintiff hates when she does this. *Id.* Plaintiff confronted Lori about it and received a disciplinary report for "trying to show the correctional officer the contents in the cup." *Id.* Plaintiff has named those nurses that deprived him of his supplies the "Jane Doe Pinckneyville Nursing Staff," which is shortened to "Pinckneyville Nursing Staff" in the Court's Case Management/Electronic Filing ("CM/ECF") system. *Id.* Nurse Lori and Nurse Sroka started crushing his pills and opening his capsules to retaliate against and punish Plaintiff, and the nursing staff has continued it. (Doc. 1, p. 12).

In April 2018, Plaintiff was placed in a cell with inmate Dawson, who was also in a wheelchair, and inmate Rodriguez. (Doc. 1, p. 13). Plaintiff witnessed Dawson threatening Rodriguez, stating that where he is from, they do not just fight to prove a point, they "kill to win the fight." (Doc. 1, p. 14). Plaintiff informed "M.H.P. Mr. Smith" about these threats and the hostile environment in his cell and asked Smith to assist him in getting moved. *Id.* Smith denied his request. *Id.* Dawson eventually began to threaten Plaintiff. (Doc. 1, p. 15). This prompted Plaintiff to seek a cell change with urgency, but all of his attempts were denied. (Doc. 1, pp. 15-16). Plaintiff was told

that the way to get moved was to refuse housing. (Doc. 1, p. 16). Plaintiff spoke with Counselor Mr. Rolla about the issue, and he said "that they do not do cell changes unless something were to happen or take place because then everybody would just continuously want to change cells." *Id.*

While Plaintiff was searching for a way to change cells, he had a serious verbal dispute with Corrections Officer ("C/O") Macalahan. (Doc. 1, p. 17). Plaintiff requested emergency medical attention, and Macalahan denied his request. *Id.* Plaintiff wrote a grievance on Macalahan and the issue, and shortly thereafter, he was approached by several inmate friends of Dawson who asked Plaintiff why he wrote a grievance on "Mac Man," which was their name for Macalahan. *Id.* The inmates went on to tell Plaintiff that Macalahan told them that Plaintiff wrote a grievance on him, and if he continued writing grievances on Macalahan, he would be considered a snitch because writing a grievance on an officer who looks out for inmates is snitching. (Doc. 1, p. 18). They said if he did not stop writing grievances on "Mac Man," harm would come to him. *Id.* They also noted that Plaintiff is an easy target because he is in a wheelchair. *Id.*

Dawson also threatened Plaintiff and told him: "You know you don't have to go home its ways to end all this shit. Leave these police alone, stop the grievance shit with 'Mac Man' before something happen to you because . . . I'll make it happen." (Doc. 1, p. 20). The next morning, Plaintiff asked Lieutenant Webb to be placed in protective custody due to safety and health concerns. *Id.* Lieutenant Webb told Plaintiff that they do not have protective custody—they have segregation— and asked Plaintiff if he wanted to go there. (Doc. 1, p. 21). Plaintiff said he did not want to get into trouble, he just wanted to go somewhere safe because everyone thought he was a snitch. *Id.* Webb responded that if Plaintiff did not lock up, he would go to segregation. *Id.* Plaintiff later asked Lieutenant Kosma for protective custody, and he had the same response. *Id.* Plaintiff believes going to segregation would have put his release date in jeopardy of being changed, and he did not want to make his time in prison any longer, so he locked up in his cell. *Id.* Plaintiff had to fill out a request to his counselor to get a grievance form to complain about being denied protective custody. (Doc. 1,

p. 22). He requested a grievance form around the time he was denied protective custody by Webb and Kosma, approximately June 19 to June 22. (Doc. 1, p. 23).

On June 24, 2018, Plaintiff overheard an inmate worker that he refers to in the Complaint as "Problem" speaking with Dawson at the door of Plaintiff's cell. (Doc. 1, p. 24). At the time, Macalahan was the wing officer. *Id.* Dawson referred to Plaintiff as a "homosexual snitch" and Problem stated: "Mac Man said 'whenever you ready handle your business, do it before your day room and try not to let him hit the button too many times because its a female in the control center.'" *Id.* Dawson got dressed, and right before he attacked Plaintiff, he told him that he did not have to go home. (Doc. 1, p. 25). Dawson stood up and struck Plaintiff in the head. *Id.* Plaintiff lunged at Dawson, knocking them both to the ground. *Id.* Plaintiff then got on top of Dawson and held him. *Id.* Rodriguez pointed out that Macalahan was in the door. (Doc. 1-1. p. 1). Macalahan looked directly at Plaintiff and Dawson but turned and walked away before Plaintiff could say anything. *Id.* After a few minutes, Dawson told Plaintiff that he would quit and that he was not doing anything. *Id.* Plaintiff climbed off Dawson and began packing his things to leave the cell. *Id.* Dawson began fiddling with his television and radio. *Id.*

Dawson then told Plaintiff: "I'm going to make sure you don't go home now." (Doc. 1-1, p. 2). He jumped from his wheelchair and stabbed Plaintiff in the right side of his head near his ear. *Id.* While Plaintiff tried to wrestle Dawson to the floor, Dawson continued to stab Plaintiff all over his body. (Doc. 1-1, p. 3). Dawson also grabbed Plaintiff's left pinky finger and tried to bite it off. *Id.* Plaintiff then hit Dawson in the eye as hard as he could so he would let Plaintiff's pinky go. *Id.* Dawson then began to scream for Problem. *Id.* Problem came to the door and told Plaintiff to get off Dawson "or else." (Doc. 1-1, p. 4). Plaintiff stayed where he was, so Problem left, and soon thereafter, the automatic lock went off in the cell. *Id.* Plaintiff got off Dawson and into his chair to try to get out of the door. *Id.* Plaintiff was covered in blood. *Id.* Several individuals blocked Plaintiff from leaving, and C/O Englan peeked in the cell. *Id.* Plaintiff screamed to get him out of the cell and

get him medical attention, but Englan told him he needed to ask his wing officer. *Id.* Plaintiff believes Macalahan was trying to protect Dawson for assaulting Plaintiff. (Doc. 1-1, p. 5).

Plaintiff cleaned himself off, packed his things, went to the day room to have his hair braided, and told Lieutenant Kosma that he needed to speak to someone in mental health. *Id.* Other inmates told Plaintiff to leave or the assaults would continue. *Id.* Plaintiff was told to place himself on crisis watch and that if officers came to get Dawson, everyone in the institution would be notified that Plaintiff snitched on Dawson. *Id.* Plaintiff therefore told Kosma that he needed to go on a crisis watch because he had a death in the family. (Doc. 1-1, p. 6). When Kosma questioned how Plaintiff knew about the death, Plaintiff lied to him about paying someone to find out. *Id.* Kosma told Plaintiff that if he was lying, he would get segregation and his out date would be delayed, but he took Plaintiff to see mental health. *Id.*

Plaintiff spoke with Ms. Mason about going on crisis watch and asked her to inform nursing staff that he had several injuries. (Doc. 1-1, pp. 6-7). When she asked how he got the injuries, he told her he fell out of his wheelchair. (Doc. 1-1, p. 7). Plaintiff also asked Mason to put him in protective custody, but she told him that she could not help him with that. *Id.* Mason did tell him that he could have everything medically necessary while he was on crisis watch, despite the usual restriction on clothing and items other than a crisis mattress and crisis blanket. *Id.* Crisis mattresses and blankets are very hard and rough. *Id.* Plaintiff was placed in Pinckneyville's Healthcare Unit Isolation Cell #3 and was given a smock and blanket. (Doc. 1-1, p. 8). When his egg crate, mattress, and medical supplies arrived, Plaintiff was denied them by medical staff and Lieutenant Kosma. *Id.* Plaintiff told them that mental health told him he could have everything medically necessary while on crisis watch, but they refused to provide him his items. *Id.* Plaintiff then asked Kosma for a crisis bed. *Id.* Kosma told him that there were no more. *Id.*

Plaintiff asked Nurse Kim to look at his head injury and finger. (Doc. 1-1, p. 9). He told her that his head was numb in that area and that he could not feel his pinky or the finger next to it. *Id.*

Plaintiff was told to put water on it, despite the visible blood, and that was all the treatment he received. *Id.* Plaintiff only had a large rectangular plastic object to lay on. *Id.* Nurse Kim asked Plaintiff what he needed, and he told her he needed his egg crate mattress or he could wake up with bedsores. *Id.* She replied that he should not have gone on crisis watch. (Doc. 1-1, p. 10). The next evening, Plaintiff had "sheared and friction-affected skin and what looked [like] several pressure sores at about stage 2." *Id.* Nurse Martin put Plaintiff's skin issue in his file, and Lieutenant Tate found Plaintiff a mattress. *Id.* Plaintiff continued to ask for protective custody. *Id.*

Plaintiff was not allowed personal hygiene items such as a toothbrush, soap, or a towel. (Doc. 1-1, p. 11). Plaintiff was not allowed to shower for over a week. *Id.* Plaintiff was also denied a cup, and because of the orientation of his sink and his disabilities, he was forced to drink water from his toilet for nine days. *Id.* Plaintiff told Lieutenant McBride about this, and he replied that Plaintiff's medical records and Christine Brown both said Plaintiff can walk. *Id.*

Nurse Tera, Lieutenant Wrangler, and a female corrections officer with red hair, identified as Jane Doe in the Complaint, denied Plaintiff a diaper change, forcing him to sit in his bowel movements for two days. (Doc 1-1, p. 12). Tera claims that it was not on paper that he should be allowed to change his diaper the morning that she was the infirmary nurse. *Id.* Nurse Reader did not let Plaintiff change his catheter after it tore, forcing him to urinate into his diaper until the next day. *Id.* Because of this, Plaintiff's diaper filled up and leaked on his mattress all night. *Id.* Plaintiff was finally allowed to shower on the eighth day. (Doc. 1-1, p. 13). Plaintiff was taken off watch the next day, but he was kept in the same housing on segregation status. *Id.*

C/O Lind asked Plaintiff why he requested protective custody, and Plaintiff told him that he feared for his health and safety from inmates, security staff, and healthcare unit staff. *Id.* Lind asked Plaintiff if his request had anything to do with Dawson, and Plaintiff told him no because he could not ensure Plaintiff's safety. (Doc. 1-1, p. 14). Lind then had Plaintiff sign a statement saying Dawson did not cause any harm to him and that he feared for his safety from inmates, security staff,

and healthcare unit staff. *Id.* Dawson was then brought to the Health Care Unit by Problem. *Id.* Lind spoke with him and returned to Plaintiff. *Id.* He accused Plaintiff of being dishonest because Dawson told him that Plaintiff started a fight with him. *Id.* Plaintiff told Lind that he had nothing to say until he was transferred and placed in protective custody. *Id.*

Lind told Plaintiff that Plaintiff would be on his way if he told him the truth. (Doc. 1-1, p. 15). He also told Plaintiff that he spoke to an informant and knew what actually took place. *Id.* Plaintiff told him the truth and showed him his injuries. *Id.* Lind took pictures of his injuries. *Id.* Plaintiff asked Lind if pictures could be taken to show the medical staff's deliberate indifference, and Lind said no. *Id.* Plaintiff also asked him if he would look into Macalahan's behavior, and Lind told Plaintiff that he got what he wanted. *Id.* Plaintiff received a disciplinary report for fighting and giving false information. *Id.* Plaintiff remains in the Health Care Unit isolation cell waiting for a wheelchair accessible cell to open in segregation. (Doc. 1-1, p. 16). He is denied a shower everyday by Jane Doe and other unknown staff. *Id.* His asthma pump and other supplies have been taken by nursing staff who refuse or give him a hard time when he asks for them. *Id.* Nursing staff members also have refused to address Plaintiff's sheared skin, pressure sores, head injury, and hand injury, despite written and verbal requests from Plaintiff.

Dawson ultimately went to segregation, so "in the eyes of every inmate" at Pinckneyville, Plaintiff is now a "verified snitch." *Id.* Plaintiff has been forced into a situation where he can either allow his cellmate to kill him or suffer disciplinary action. (Doc. 1-1, p. 18). On June 9, 2018,[1] Plaintiff received another retaliatory disciplinary report by Lieutenant Kosma after Plaintiff got into a verbal altercation with C/O Mitchell about his light being left on for three hours. *Id.* Plaintiff should have been able to have his light turned on or off at his request because he is no longer on crisis watch. *Id.*

---

[1] The Court notes that, though Plaintiff claims this report was issued on June 9, 2018, given the context, Plaintiff may have meant July 9, 2018.

Plaintiff claims more of the area surrounding his stab wound is becoming numb. (Doc 1-1, pp. 25-26). He also claims that his finger is broken or fractured and that he cannot feel or use it, which is made even more serious by the fact that he is left handed. (Doc. 1-1. p. 26). Plaintiff has open sores and torn skin on his legs, and he does not get showers despite the fact that he uses enemas, touches his urine bag, sweats, and does not get laundry. *Id.* This puts him "at a severe risk of a staph infection or worse." *Id.*

Section 501.310(a) of the IDOC Administrative Code states that "each maximum security facility shall maintain a protective custody area for placement of committed persons in protective custody." (Doc. 1-1. p. 23). Section 501.310(b) states that the protective custody area shall not be physically located on the same gallery as disciplinary segregation, and neither general population nor disciplinary segregation individuals shall be permitted to have access to this area except as approved by the Chief Administrative Officer. *Id.* Plaintiff "is almost certain that the Illinois Department of Corrections does not hold such housing for wheelchair-bound individuals as protective custody status." (Doc. 1-1. p. 24). Plaintiff also believes that he is being punished and written false major disciplinary reports so IDOC can validate his placement. *Id.* Plaintiff also claims the defendants are using segregation as a way to withhold legal work and materials from him while he is in the discovery stage of another civil rights suit, *Bradley v. Dennison*, No. 17-cv-862-MJR-SCW. (Doc. 1-1, p. 25).

Plaintiff requests injunctive relief. (Doc. 1-1, p. 33). Among other things, Plaintiff seeks to be placed in a local, county, or federal institution if there is no protective custody for wheelchair-bound individuals in an IDOC facility, along with all of his personal property and legal work. (Doc 1-1, pp. 24-25). He also requests emergency medical attention. (Doc. 1-1, p. 25). Plaintiff wants his asthma pump and medical supplies to be returned to him and for all lines of communication between him and any inmates, healthcare staff, and security staff to be cut. (Doc. 1-1. p. 33). Further, he seeks permanent separation from various individuals while he remains in IDOC custody and an order that

he never return to Pinckneyville for the remainder of his incarceration. (Doc. 1-1, pp. 34-35). Plaintiff also seeks monetary damages. (Doc. 1-1, p. 36).

<u>Discussion</u>

Based on the allegations of the Complaint and the claims specifically articulated by the Plaintiff, the Court finds it convenient to divide the *pro se* action into thirteen counts. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these counts does not constitute an opinion regarding their merit.

**Count 1 –** Pinckneyville Nursing Staff showed deliberate indifference to Plaintiff's serious medical need for supplies to accommodate his disabilities by denying him non-adhesive adult male briefs and non-adhesive external male catheters, in violation of the Eighth Amendment.

**Count 2 –** Nurses Lori and Sroka retaliated against Plaintiff for filing grievances and verbally complaining about his medical treatment by crushing his medication, opening his capsules, and writing a false disciplinary report against him, in violation of the First Amendment.

**Count 3 –** Counselor Rolla violated Plaintiff's right to an adequate grievance procedure through Pinckneyville's practice of requiring inmates to request grievance forms from counselors rather than having them available in cell houses.

**Count 4 –** Kosma and Webb failed to protect Plaintiff from a substantial risk of serious harm by denying him protective custody, in violation of the Eighth Amendment.

**Count 5 –** Macalahan failed to protect Plaintiff by telling inmates Plaintiff wrote a grievance against him, enlisting Dawson to harm Plaintiff, and failing to report Dawson's attack on Plaintiff, in violation of the Eighth Amendment.

**Count 6 –** Macalahan retaliated against Plaintiff for writing a grievance against him by telling inmates Plaintiff wrote the grievance, enlisting Dawson to harm Plaintiff, and failing to report Dawson's attack on Plaintiff, in violation of the First Amendment.

**Count 7 –**       Tera, Reader, Wrangler, Kim, Jane Doe, and Kosma showed deliberate indifference to Plaintiff's serious medical needs while he was on crisis watch by failing to provide him his egg-crate mattress and medical supplies, diaper and catheter changes, asthma pump, and drinking cup, in violation of the Eighth Amendment.

**Count 8 –**       Lind failed to protect Plaintiff by denying him protective custody and placing him in segregation instead even though Plaintiff was defending himself from his cellmate and trying to protect himself by not snitching, in violation of the Eighth Amendment.

**Count 9 –**       Kim showed deliberate indifference to Plaintiff's serious medical needs by failing to provide him treatment for his head and finger injury after he was attacked, in violation of the Eighth Amendment.

**Count 10 –**      Jane Doe and Correctional Staff are subjecting Plaintiff to unconstitutional conditions of confinement by refusing to allow him to shower, in violation of the Eighth Amendment.

**Count 11 –**      Plaintiff has been denied protective custody and suffered an attack from another inmate because the Illinois Department of Corrections does not have wheelchair accessible protective custody housing in violation of the ADA and the Rehabilitation Act.

**Count 12 –**      Defendants have violated Plaintiff's right to access the courts by using segregation to withhold legal work and materials from Plaintiff despite his being in the discovery stage of another civil rights lawsuit, in violation of the First Amendment.

**Count 13 –**      Kosma retaliated against Plaintiff for filing grievances and/or complaining about his conditions by issuing him a false disciplinary report, in violation of the First Amendment.

For the reasons articulated below, Counts 2, 4, 5, 6, 7, 9, 10, 11, and 13, along with Plaintiff's request for a preliminary injunction, will proceed. As explained below, Plaintiff's request for a Temporary Restraining Order ("TRO") shall be denied at this time without prejudice. Any other intended claim that has not been recognized by the Court is considered dismissed without prejudice as inadequately pleaded under the *Twombly* pleading standard. Further, to the extent Plaintiff sought to bring claims against individuals or entities not included in the case caption, these individuals or entities will not be treated as defendants in this case, and any claims against them should be considered dismissed without prejudice. *See Myles v. United States*, 416 F.3d 551, 551-52 (7th Cir.

2005) (defendants must be "specif[ied] in the caption").

**Denial of Request for TRO**

A TRO is an order issued without notice to the party to be enjoined that may last no more than fourteen days. A TRO may issue without notice:

> only if (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

FED. R. CIV. P. 65(b).

In order to obtain injunctive relief under Rule 65, Plaintiff must demonstrate that: (1) his underlying case has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) Plaintiff will suffer irreparable harm without the injunction. *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007). If those three factors are shown, the district court must then balance the harm to each party and to the public interest from granting or denying the injunction. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). The United States Supreme Court has emphasized that a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 870 (7th Cir. 2006) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)).

Without expressing any opinion on the merits of Plaintiff's other claims for relief, the Court concludes that a TRO should not issue in this matter. Plaintiff's allegations do not set forth specific facts demonstrating the likelihood of immediate and irreparable harm *before Defendants can be heard*. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunctive Relief (Doc. 2) will therefore be **DENIED** to the extent it requests a TRO, but **REFERRED** to a United States Magistrate Judge for further consideration of Plaintiff's request for preliminary injunctive relief. Because wardens are generally responsible for ensuring that injunctive relief is carried out, the

Warden of Pinckneyville Correctional Center will be added as a defendant in this action, in his or her official capacity only, for the purpose of carrying out any injunctive relief that is granted.[2] *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

## Count 1 – Pinckneyville Nursing Staff

The Court need not reach the merits of Count 1 as Plaintiff has associated an improper defendant with this claim. "A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014); *see Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'") (citation and quotation marks omitted). A group of people, such as Pinckneyville Nursing Staff, is not a "person" subject to suit pursuant to § 1983. Further, Plaintiff's general allegations against this group fail to satisfy the *Twombly* pleading standard, in that no specific defendants are put on notice of the claims brought against them so that they can properly answer the Complaint. *See Twombly*, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2). Thus, Pinckneyville Nursing Staff will be dismissed with prejudice from this action, though this dismissal is without prejudice to Plaintiff bringing a claim against individual members of the nursing staff.

## Counts 2, 6, and 13 – Retaliation

To establish a claim of retaliation, Plaintiff "must show that he engaged in a protected activity, he suffered a deprivation likely to prevent future protected activities, and there was a causal connection between the two." *Felton v. Huibregtse*, 525 F. App'x 484, 486 (7th Cir. 2013) (citing *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). Plaintiff has stated such a claim against Lori, Sroka, Macalahan, and Kosma, so Counts 2, 6, and 13 will proceed.

---

[2] Federal Rule of Civil Procedure 21 states in pertinent part: "On motion or on its own, the court may at any time, on just terms, add or drop a party."

## Count 3 – Grievance Procedure

The Seventh Circuit has "specifically denounc[ed] a Fourteenth Amendment substantive due process right to an inmate grievance procedure." *Grieveson v. Anderson*, 538 F.3d 763, 772 (7th Cir. 2008). As explained in *Antonelli v. Sheahan*, 81 F.3d 1422, 1430-31 (7th Cir. 1996), "any right to a grievance procedure is a procedural right, not a substantive one. Accordingly, a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause." *Id.* at 1430-31(internal citations omitted). Because Plaintiff had no expectation of a particular outcome of his grievances or complaints, there is no viable claim which can be vindicated through 42 U.S.C. § 1983. *Juriss v. McGowan*, 957 F.2d 345, 349 n.1 (7th Cir. 1992).

Further, though the Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust all available administrative remedies before filing a suit in federal court, administrative remedies are considered to be unavailable under the PLRA when prison officials fail to respond to a prisoner's grievances. *See* 42 U.S.C. § 1997e(a); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (citations omitted). In addition, "exhaustion is not required when the prison officials responsible for providing grievance forms refuse to give a prisoner the forms necessary to file an administrative grievance." *Hill v. Snyder*, 817 F.3d 1037, 1041 (7th Cir. 2016). A plaintiff who can demonstrate the unavailability of administrative remedies is relieved from the obligation to exhaust administrative remedies and can proceed with his or her suit. *Lewis*, 300 F.3d at 833.

Accordingly, Plaintiff cannot bring a due process or access to courts claim based on Pinckneyville's practice of requiring inmates to seek grievance forms from their counselors. Count 3 will therefore be dismissed with prejudice.

## Counts 4 and 8 – Failure to Protect against Kosma, Webb, and Lind

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal citations omitted). "To adequately plead a failure-to-protect claim, a prisoner must allege that

officials were subjectively aware of and disregarded an objectively serious risk of harm to the prisoner." *Cobian v. McLaughlin*, 717 F. App'x 605, 610 (7th Cir. 2017) (citing *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). At this early stage, Plaintiff has stated a failure to protect claim against Kosma and Webb for failing to place him in protective custody or otherwise protect him when Plaintiff told them that everyone thought he was a snitch and he was in danger. Plaintiff has failed to state a failure to protect claim against Lind, however. Plaintiff claims that Lind violated his Eighth Amendment rights by denying him protective custody after Plaintiff told him that Dawson attacked him, instead placing him in segregation. Plaintiff does not claim that he is presently at risk of attack in segregation or that Lind was aware of a specific, impending, and substantial threat to Plaintiff's safety, particularly given his isolated placement. *See Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996).

Accordingly, Count 4 will proceed past the screening stage, and Count 8 will be dismissed from this action without prejudice for failure to state a claim upon which relief may be granted.

### Count 5 – Failure to Protect against Macalahan

The intentional identification of an inmate as a government witness or "snitch" may give rise to a failure to protect claim under the Eighth Amendment, *see Brown v. Narvais*, 265 F. App'x 734, 736 (10th Cir. 2008) ("allegations of a prison officer's deliberate disclosure of dangerous information about an inmate's status are sufficient to state a claim under the Eighth Amendment provided the alleged danger is facially concrete and plausible enough to satisfy basic pleading standards."), as can a prison official's intentional heightening of the risk of future injury to a prisoner, even if a prisoner is not ultimately injured. *See Wright v. Miller*, 561 F. App'x 551, 555 (7th Cir. 2014) (citing *Budd v. Motley,* 711 F.3d 840, 843 (7th Cir. 2013); *see also Thomas v. Illinois,* 697 F.3d 612, 614–16 (7th Cir. 2012) (explaining that "hazard, or probabilistic harm" could allow recovery); *Irving v. Dormire,* 519 F.3d 441, 449 (8th Cir. 2008) (concluding that guard's alleged attempts to induce other inmates to assault plaintiff prisoner "posed a substantial risk of serious harm to [the prisoner's] future health")).

Macalahan allegedly identified Plaintiff as the equivalent of a snitch to other inmates and enlisted Dawson to attack him, heightening his risk of attack. This states a failure to protect claim against Macalahan, so Count 5 will proceed against him.

## Counts 7 and 9 – Deliberate Indifference to Medical Needs

The Eighth Amendment to the United States Constitution protects prisoners from cruel and unusual punishment. *See Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state a claim, a prisoner must show that: (1) he suffered from an objectively serious medical need; and (2) state officials acted with deliberate indifference to the prisoner's medical need, which is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Plaintiff's claims that Tera, Reader, Wrangler, Kim, Jane Doe, and Kosma showed deliberate indifference to Plaintiff's serious medical needs while he was on crisis watch by failing to provide him his egg-crate mattress and medical supplies, diaper and catheter changes, asthma pump, and drinking cup, causing him to develop skin issues and pressure sores, suffer in his own waste, and drink out of his toilet, state a claim upon which relief may be granted against these defendants. Similarly, Plaintiff's allegation that Kim failed to treat his injuries from the attack also state a claim. Counts 7 and 9 will therefore proceed.

## Count 10 – Unconstitutional Conditions of Confinement

To prevail on an Eighth Amendment claim based on inadequate prison conditions, the prisoner must show that (1) the conditions in the prison were objectively "sufficiently serious so that a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," and (2) prison officials acted with deliberate indifference to those conditions. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal citations omitted).

Plaintiff claims that Jane Doe and other unknown correctional staff members have denied

him showers during his time in the healthcare unit, save for one shower he was allowed on his eighth day. He also claims that he does not get laundry. It is unclear whether Plaintiff being deprived of all but one shower during his thus far relatively brief stint in the health care unit cell would constitute an unconstitutional condition of confinement standing alone. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 744-45 (7th Cir.2013) (no violation for access to showers that is only weekly). His lack of access to both laundry and showers, combined with his particular medical issues that may make more frequent showers necessary to avoid serious harm, however, make it impossible for this Court to decide at this stage whether Plaintiff's conditions were sufficiently serious. Accordingly, Count 10 will proceed against Jane Doe. But for the same reasons as those that apply to the Pinckneyville Nursing Staff, the Correctional Staff, as a group, will be dismissed from this action with prejudice but without prejudice to Plaintiff bringing claims against individual correctional staff members.

## Count 11 – ADA and Rehabilitation Act

Plaintiff does not specifically assert a claim against the defendants under the ADA or the Rehabilitation Act. Nonetheless, courts "are supposed to analyze a litigant's claims and not just legal theories that he propounds," particularly when a litigant is proceeding *pro se*. *See Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2010) (citations omitted). On this basis, the Court will *sua sponte* recognize claims under the ADA and/or Rehabilitation Act. The ADA and Rehabilitation Act prohibit discrimination against qualified individuals because of their physical or mental disability, including a failure to accommodate a disability. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). In order to make out a *prima facie* case of discrimination under both the ADA and the Rehabilitation Act, a plaintiff must show: (1) that he suffers from a disability as defined in the statutes, (2) that he is qualified to participate in the program in question, and (3) that he was either excluded from participating in or denied the benefit of that program based on his disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005).

The allegations in the Complaint suggest that Plaintiff suffers from a disability as defined in the ADA and Rehabilitation Act. Plaintiff claims there are no protective custody units that can accommodate wheelchair-bound inmates. He also claims that he has repeatedly requested protective custody due to the danger he faces from other inmates perceiving him as a snitch, but he has been denied protective custody, attacked, disciplined, and placed in segregation because the protective custody cells will not accommodate him. At this early stage, the Court cannot say that these allegations are insufficient to state an ADA and/or Rehabilitation Act claim.

Notably, the only proper defendant in a claim under the ADA or Rehabilitation Act is the state agency (or a state official acting in his or her official capacity). "[E]mployees of the Department of Corrections are not amenable to suit under the Rehabilitation Act or the ADA. *See* 29 U.S.C. § 794(b); 42 U.S.C. § 12131." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012) (additional citations omitted). All of the named defendants will therefore be dismissed with prejudice from Count 11, as they are not susceptible to these claims under the ADA or Rehabilitation Act. Count 11 shall proceed against the IDOC, however, and the Clerk shall be directed to add this entity as a party defendant.

## Count 12 – Access to Courts

The Seventh Circuit uses a two-part test when determining whether the conduct of a prison official violates an inmate's right of access to the courts. *Lehn v. Holmes*, 364 F.3d 862, 868 (7th Cir. 2004). First, the inmate must show that prison officials failed "to assist in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Jenkins v. Lane,* 977 F.2d 266, 268 (7th Cir. 1992) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). Second, the inmate must be able to show "some quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of plaintiff's pending or contemplated litigation." *Alston v. DeBruyn*, 13 F.3d 1036, 1041 (7th Cir. 1994); *see also Lehn*, 364 F. 3d at 868. A plaintiff must explain "the connection between the alleged

denial of access . . . and an inability to pursue a legitimate challenge to a conviction, sentence, or prison conditions." *Ortiz v. Downey*, 561 F.3d 664, 671 (7th Cir. 2009) (internal quotation and citation omitted); *accord Guajardo Palma v. Martinson*, 622 F.3d 801, 805-06 (7th Cir. 2010). This requires Plaintiff to identify the underlying claim that was lost. *See Christopher v. Harbury*, 536 U.S. 403, 416 (2002); *Steidl v. Fermon*, 494 F.3d 623, 633 (7th Cir. 2007).

Plaintiff has failed to meet the second prong of the access to courts test. Though he claims that he is presently in the discovery stage of another civil rights lawsuit, he fails to allege how prison staff denying him access to legal materials has interrupted this litigation or caused him to lose a claim. Without such allegations, Plaintiff's access to courts claim must fail. Count 12 will therefore be dismissed without prejudice for failure to state a claim.

### Identification of Unknown Defendant

Plaintiff shall be allowed to proceed with Counts 7 and 10 against Defendant Jane Doe. Of course, this defendant must be identified with particularity before service of the Complaint can be made on her. Where a prisoner's Complaint states specific allegations describing conduct of individual prison staff members sufficient to raise a constitutional claim, but the names of those defendants are not known, the prisoner should have the opportunity to engage in limited discovery to ascertain the identity of those defendants. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009). In this case, the Warden of Pinckneyville Correctional Center will be responsible for responding to discovery aimed at identifying Defendant Jane Doe. Guidelines for discovery will be set by the United States Magistrate Judge. Once the name of this defendant is discovered, Plaintiff shall file a motion to substitute the newly identified defendant in place of the generic designation in the case caption and throughout the Complaint.

**Disposition**

The Court **DIRECTS** the Clerk of Court to add Warden of Pinckneyville Correctional Center as a defendant, in his or her official capacity only, for the purpose of carrying out any injunctive relief that is ordered and responding to discovery aimed at identifying Jane Doe.

The Court further **DIRECTS** the Clerk to add the Illinois Department of Corrections as a defendant.

**IT IS HEREBY ORDERED** that **COUNTS 1**, **8**, and **12** are **DISMISSED** without prejudice for failure to state a claim upon which relief may be granted.

**IT IS FURTHER ORDERED** that **COUNT 2** shall **PROCEED** against **LORI** and **SROKA**.

**IT IS FURTHER ORDERED** that **COUNT 3** is **DISMISSED** with prejudice for the reasons stated above.

**IT IS FURTHER ORDERED** that **COUNT 4** shall **PROCEED** against **KOSMA** and **WEBB**.

**IT IS FURTHER ORDERED** that **COUNTS 5** and **6** shall **PROCEED** against **MACALAHAN**.

**IT IS FURTHER ORDERED** that **COUNT 7** shall **PROCEED** against **TERA**, **READER**, **WRANGLER**, **KIM**, **JANE DOE**, and **KOSMA**.

**IT IS FURTHER ORDERED** that **COUNT 9** shall **PROCEED** against **KIM**.

**IT IS FURTHER ORDERED** that **COUNT 10** shall **PROCEED** against **JANE DOE** and will be dismissed with prejudice against **CORRECTIONAL STAFF**, though this dismissal is without prejudice to Plaintiff bringing a claim against individuals members of the Pinckneyville correctional staff.

**IT IS FURTHER ORDERED** that **COUNT 11** shall **PROCEED** against the **ILLINOIS DEPARTMENT OF CORRECTIONS**.

**IT IS FURTHER ORDERED** that **COUNT 13** shall **PROCEED** against **KOSMA**.

**IT IS FURTHER ORDERED** that **PINCKNEYVILLE CC NURSING STAFF** and **CORRECTIONAL STAFF** are **DISMISSED** from this action with prejudice for the reasons stated above.

**IT IS FURTHER ORDERED** that **C/O LIND** and **COUNSELOR ROLLA** are **DISMISSED** from this action without prejudice for failure to state a claim upon which relief may be granted.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2) is **DENIED** to the extent Plaintiff seeks a TRO. Plaintiff's Motion (Doc. 2) remains **PENDING**, however, and is **REFERRED** to Magistrate Judge Wilkerson for consideration of Plaintiff's motion for preliminary injunction.

**IT IS FURTHER ORDERED** that the Clerk of Court shall take appropriate steps in coordination with the United States Marshals Service, to effect formal, **PERSONAL SERVICE** of summons, the Complaint (Doc. 1), the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2), and this Order upon each remaining Defendant at his or her work address, as provided by Plaintiff. The Court will not require Defendants to pay the full costs of formal service, as the Court is ordering personal service to expedite the resolution of Plaintiff's Motion for a Preliminary Injunction.

The United States Marshals Service is **APPOINTED** pursuant to Federal Rule of Civil Procedure 4(e) to effect service. The Clerk is **DIRECTED** to complete, on Plaintiff's behalf, a summons and form USM-285 for service of process on Defendants **LORI, SROKA, WEBB, MACALAHAN, KOSMA, KIM, WRANGLER, JANE DOE** (once identified), **TERA, READER, WARDEN OF PINCKNEYVILLE CORRECTIONAL CENTER** (official capacity only), and the **ILLINOIS DEPARTMENT OF CORRECTIONS**. Personal service on the Director of the Illinois Department of Corrections shall constitute personal service of the Illinois Department

of Corrections. *See* FED. R. CIV. P. 4(j)(2)(A). The Clerk shall issue the completed summons, and prepare a service packet for each Defendant consisting of: the completed summons, the completed form USM-285, a copy of the Complaint (Doc. 1), a copy of the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2), and this Memorandum and Order. The Clerk shall deliver the service packets for each Defendant to the United States Marshals Service for personal service on each Defendant.

Pursuant to Federal Rule of Civil Procedure 4, on or before **July 30, 2018**, the United States Marshals Service **SHALL PERSONALLY SERVE** upon Defendants **LORI, SROKA, WEBB, MACALAHAN, KOSMA, KIM, WRANGLER, JANE DOE** (once identified), **TERA**, **READER**, **WARDEN OF PINCKNEYVILLE CORRECTIONAL CENTER** (official capacity only), and **ILLINOIS DEPARTMENT OF CORRECTIONS,** the service packets containing the summons, form USM-285, a copy of the Complaint (Doc. 1), the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2), and this Memorandum and Order. **LEAVING THE SUMMONS WITH THE PRISON'S LITIGATION COORDINATOR IS NOT SUFFICIENT – each Defendant must be personally served**. All costs of service shall be advanced by the United States, and the Clerk shall provide all necessary materials and copies to the United States Marshals Service.

In order to assist the Court in its resolution of the motion for preliminary injunctive relief, Defendants **LORI, SROKA, WEBB, MACALAHAN, KOSMA, KIM, WRANGLER, JANE DOE** (once identified), **TERA**, **READER**, **WARDEN OF PINCKNEYVILLE CORRECTIONAL CENTER** (official capacity only), and **ILLINOIS DEPARTMENT OF CORRECTIONS SHALL FILE A RESPONSE** to the motion within 14 days of the date of service of the summons.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to United States Magistrate Judge Donald G. Wilkerson for further pre-trial proceedings, including for consideration of Plaintiff's Motion for Preliminary Injunction. Because the Court finds that Plaintiff's motion for preliminary injunction deserves prompt consideration, United States Magistrate Judge Wilkerson shall address the motion as soon as practicable.

Further, this entire matter shall be **REFERRED** to United States Magistrate Judge Wilkerson for disposition, pursuant to Local Rule 72.2(b)(3) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, whether or not he is granted leave to proceed *in forma pauperis*. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:  July 16, 2018**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**